Marr, J.
In February, 1870, Louis Desobry, who resided in the Parish of Iberville, deposited with Henry Tete, a commission merchant of New Orleans, $22, 000, for which Tete gave him a receipt as follows : “$22,000. Received, New Orleans, February 3d, 1870, from Mr. Louis Desobry, the sum of twenty-two thousand dollars, to be invested for his account, interest on said amount to be paid every six months.”
On the eighteenth February Desobry placed with Téte the addi *810 tional sum of $3000, of which. $2000 were withdrawn on the sixth February, 1871, leaving balance, $23,000, in the hands of Téte.
Téte was the factor and commission merchant of Dardenne and wife, and on February 10,1872, there was a balance due them of $2000, which Dardenne left with Téte, taking Téte’s note for the amount, at one year, to his order. On the eleventh August, 1873, Dardenne and wife transferred this note to plaintiff.
Téte was also the commission merchant of Edward Desobry; and, on the twenty-fourth January, 1873, there was a balance in his favor of $1068 48. On the fourteenth August, 1873, Edward Desobry transferred this account to plaintiff.
Tete suspended about January, 1873. On the twenty-sixth July he was adjudicated a bankrupt, on his own petition; and, in due course, he was finally discharged.
In November, 1873, this suit was brought by Louis Desobry to recover the aggregate of the several claims just mentioned, amounting to $26,065 48. Téte pleaded and relied solely upon his discharge in bankruptcy. The District Judge, on the authority of the decision in Banning vs. Blakely, 27 A. 257, that commission merchants when exercising their functions as such are acting in a fiduciary capacity, and are not relieved from their obligations, contracted in that capacity, by a discharge in bankruptcy, rendered judgment in favor of plaintiff for the full amount demanded. The question is was this a correct interpretation of section 33 of the Bankrupt Act, which is as follows:
“No debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any fiduciary character, shall be discharged under this act.”
The allegation of the petition with respect to the d.ebt represented by the note of February 10, 1872, is:. “ That said sum of $2000 remained a trust fund in the hands of Tete; and he is bound to account for the same as such.”
Tete says, after selling the crop, there remained a balance to the credit of Dardenne of something over $2000 ; that Dardenne took the excess and asked Téte to give his note for the $2000; and that he Téte, did not propose this mode of settlement.
Dardenne being asked why the note was given, why he took the note, answered: “ I stated to Mr. Téte that I did not wish any amount to show, or any balance to show upon his books to my credit: That I was afraid my creditors would garnishee it in his hands, therefore I wished-to protect myself as a precautionary measure on my part. I said the money shall remain here, and to show that the money is here I will take your note for the sum ; and he gave me his simple note without interest. I told him I did not want it to show on the books ; *811 and that still left the money in his hands.” He also states that while he held this note he drew sight drafts on Tete which were paid.
Whatever the relations between Dardenne and Téte may have been originally, their relation with respect to the $2000 after the giving of the note, February 10, 1872, was simply that of debtor and creditor; and that relation did not result from any suggestion on the part of Téte, but from Dardenne’s dishonest purpose to secure the money against the pursuit of his creditors, according to his own testimony. His statement indicates that he used part of the money, at least, for plantation purposes, by sight drafts on Téte. This part of the demand of plaintiff deserves no further notice or comment; and it may be eliminated at once.
The allegation of the petition with respect to the account transferred by Edward Desobry to Louis Desobry is that the balance shown by that account “ is a trust fund in his (Téte’s) hands.”.
This account begins January 17,1872, with a balance of $2583 60, in favor of Desobry, from the last account rendered. Desobry shipped his crops to Téte, which Tete sold for his account, and carried proceeds to his credit, the whole amounting to $8266 20. He ordered goods and supplies, which Téte bought and shipped to him, from time to time during the year; and he drew sight drafts on Téte as his convenience required, amounting to $7200 72, to his debit, leaving balance due him at the close of the account, January 24,1873, $1065 48.
In Chapman vs. Forsyth, 2 Howard 208, suit was brought in the Circuit Court of the United States, to recover the proceeds of 150 bales of cotton, shipped to and sold by Forsyth, a factor and commission merchant, for account of the owner. Forsyth pleaded his discharge under the Bankrupt Act of 1841; and plaintiff demurred. The judges were divided in opinion; and one of the questions certified to the Supreme Court of the United States was:
“Is a commission merchant and factor, who sells for others, indebted in a fiduciary capacity, within the act. provided he withholds the money received for property sold by him, and which property was sold on account of the owner, and the money received on the owner’s account ?”
The first section of the bankrupt act under which this question arose excluded from the operation of the discharge “ debts created in consequence of a defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity.”
The court decided, without dissent, after full argument, that the factor was not acting in a fiduciary capacity, within the meaning of the act, in the case stated.
*812 It is obvious that the words used in section 33, of the act of 1867, “ While acting in any fiduciary character,” mean nothing more, nothing less, than the corresponding words in the first section of the act of 1841, “ while acting in any other fiduciary capacity.” The words “ character ” and “ capacity,” as used, are synonymous ; and the other slight difference in the phraseology is the necessary consequence of the omission, in the act of 1867, of the words, “ executor, administrator, guardian, or trustee,” used in the act of 1841. As these several fiduciaries are specially'mentioned in the act of 1841, it was necessary, in order that all fiduciaries should be included, to use the word “ other ” between the words “any” and “fiduciary;” but as the act of 1867 does not designate any fiduciaries specially, it was necessary, to suppress the word “ other” and to use only the word “any,” in order to include all fiduciaries, as the intention of both acts was.
In Owsley vs. Cobin, Nat. Bankrupt Register, 15, p. 489, the plaintiff shipped to defendants certain goods for sale on commission, which defendants sold; and they rendered account sales, showing net proceeds, which they failed to pay. The question was whether this was a debt contracted in a fiduciary capacity, within the intendment of section 33 of the act of 1867. The case was tried in the Circuit Court of the United States in South Carolina, in June, 1877, before the Circuit Judge and the District Judge. Under instructions by the court the jury found a verdict for the defendants. There was a motion for new trial, which was heard by Chief Justice Waite. His opinion was “that the debt due by the defendants in this case, as factors or commission merchants, is not such a debt, contracted in a fiduciary capacity, as is contemplated by the act of Congress to be excepted from the operation of a discharge, in bankruptcy.” And the new trial was refused. It will be observed that these two cases differ essentially from the case under consideration. It does not appear in Forsyth’s case, nor in Cobin’s case, that there was any account current between the factors and the owners of the goods; and the relation between them, on the facts stated, was apparently that of principal and agent, purely and simply.
In the present case the account sued on begins with a balance, showing previous dealing. It was an account current running through an entire year. Every one doing business with a factor and leaving balances in his hands, against which he draws at sight, at his pleasure, understands that the factor does not keep the money in his safe or about his person ; and that, in the nature of things, he could not open a separate bank account, or make special deposits, for each one of the numerous persons whose property he has received and sold on commission. By common consent, and necessarily, in all such cases, the money *813 received by the factor is deposited in bank to the credit of-the factor; and when the owner demands his, in whole or in part, by draft or otherwise, the factor draws his own check, against his own bank account, for the amount.
In many cases the relation between the factor and those whose property he receives and sells on commission would seem to be merely that of principal and agent. But where the one is receiving and selling, from time to time, and the other draws at his convenience, and there are numerous debits and credits in account current, resulting in a balance in favor of the one or the other, the relation between them -is no longer merely that of agency. So well is this understood, that factors, in such cases, in the absence of an agreement to the contrary, usu.ally keep an interest account, which a mere agent would not think of doing. By the consent of both parties, by their course of dealing, the relation is that of debtor and creditor ; and the balance with which the account may close, against the factor, is not a debt created by him while acting in a fiduciary character, within the meaning and intendment of the bankrupt act of 1867. We accept the decision of the Supreme Court of the United States in Forsyth’s case, and that of Chief Justice Waite in Cobin’s case, as authoritative interpretations of statutes of the United States; and we can not assent to the contrary doctrine, maintained by our predecessors in Banning vs. Bleakly, 27 A.
It is not charged in the petition that any part of the demand of plaintiff is “ a debt created by the fraud or embezzlement of the bankrupt ; ” nor are the words “ fiduciary character ” or “ fiduciary capacity ” used in the petition. With respect to the balance of account sued for, as in reference to the Dardenne note, the distinct and only charge implying a fiduciary relation is that the amount is a trust fund in the hands of Tete. We do not find the words “trust fund” in section 33 of the bankrupt act; and we can not conceive of any such thing as a trust fund, in any legal acceptation of the term, except such fund as may be in the hands of some public officer, or of an executor, or an administrator, or a guardian, or a trustee, technically so called, and held for the special purposes designated by law, or resulting from the nature of the appointment. We presume that the words are used in the petition to express the idea that these two debts were created by Téte while acting in a fiduciary character. It is clear from the decisions in the cases of Forsyth and Cobin, and in Buckner’s case, 2 A. 1023, that they are not trust funds; and that they are not debts created in a fiduciary capacity.
As to the money placed by Desobry with Téte for investment, the allegations of the petition are, that Desobry instructed Téte so to invest as that the interest should be collectible every six months *814 * * “That from time to time Téte rendered to petitioner accounts showing the collection of said interest, and petitioner believed he had said funds invested in good securities. But lately, to wit, about the eighteenth January, or shortly afterward, said Téte represented to petitioner that he had never performed the trust confided to him, but had, in violation thereof, unknown to petitioner, retained said funds in his own possession.”
The receipt given by Tete is silent as to the manner in which the money was to be invested, and as to the rate of interest. Téte was doing a very large commission business. His credit was very good, and he was reputed to be worth $200,000; and, upon the mere showing of the receipt itself, if he retained Desobry’s money, believing, as no doubt he and Desobry both believed at the time, that it was safe in his hands, his use of it in his business would not have involved either actual fraud or moral turpitude, or intentional wrong.
In Neal vs. Clark, 5 Otto, 704, on error to the Supreme Court of Appeals of Virginia, that court had decided that a bankrupt not chargeable with actual fraud, but who had committed constructive fraud under the State law, was not entitled to the benefits of his discharge in bankruptcy. The Supreme Court of the United States reversed the decision of the Virginia court; and held that the “fraud” referred to in section 33 of the act of 1867 “ means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong ; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith.” The constructive fraud committed by the Bankrupt is not within the meaning of the act; and “ his discharge in bankruptcy affords him complete protection.” P. 709.
It is not charged in the petition, in distinct terms, that there was fraud or embezzlement on the part of Tete. These are grave charges. Either, if proven, would suffice to deprive the bankrupt of the benefits of his discharge; and one of them is a crime, punishable, under the State law, by imprisonment in the penitentiary. They must be set forth and charged in distinct terms before they can be the subject of judicial inquiry: and they are not to be deduced, inferentially, from statements in the pleadings which may be susceptible of a different interpretation. There is nothing in the allegations of the petition from which it can be-inferred that Téte intended, at the time he used Desobry’s money, to deprive Desobry either of the principal or the interest; or that he did not intend to account faithfully for the interest, at the end of every six months, and to return the principal whenever it should be demanded.
The proof shows that Téte rendered accounts to Desobry every six months ; and Desobry admits that they were received by him from *815 time to time. These accounts include dealings to a large amount; and each of them closes with a balance in favor of Desobry. The form of the entry of the semi-annual interest is the same in all these accounts ; and that in the first account will serve as an example: “By six months interest on $22,000, from February 5,1870, to August 5,1870, at ten per cent, $1100. By six months interest on $3000, from February 18,1870, to August 18,1870, at ten per cent, $150.”
There was nothing in these accounts to mislead Desobry, or to indicate that the money had been invested in securities of any kind; and there was no charge, in any of them, for commissions for investing, or for collecting the interest. No one would suppose that a merchant, doing only a factorage and commission business, could afford to look around and find safe securities in which to invest so large an amount, at so high a rate of interest, payable every six months, without some pecuniary compensation; and if any conclusion, as to the manner of the investment, could be deduced from the accounts, it would be that Téte had invested the money in his own business, and charged himself with the interest; and not that he had, gratuitously, made investments on such favorable terms in good securities, and collected and accounted for the interest so promptly for nearly three years, without the loss of a day to Desobry, as a mere matter of friendly agency.
Desobry says he never authorized Tete to retain the money himself, either verbally or in writing. “ There were no directions given Mr. Téte in what he should invest my funds; but it was understood these funds would be invested in commercial and mortgage paper which should be doubly and triply secured. This was so understood in the conversation at his office, at which no one but he and myself were present.”
Mr. Desobry must have known that those who are able to furnish such securities as he describes can always obtain money, on much better terms than he required, from banks and other corporations, and individual capitalists.
Téte’s explanation of this business is: “After giving the receipt to Mr. Desobry he stated that he would rather have a fixed rate of interest for his money, of ten per cent, payable every six-months. I told him it would be a hard case if I had to invest the money outside, as frequently the money would be idle, and would have to remain in our hands for fifteen to twenty days at a time, without interest. He said he would rather have the money remain with me, at a fixed rate of interest of ten per cent per annum; and with this understanding I took the money.” To the other question : “ Did you give him credit accordingly on your books?” Tete answered: “Yes, that account was never charged with any investment made on his account.”
*816 Again, Tete was asked whether it was true, as alleged in the petition, that it was only about the eighteenth January that he, Tete, represented to Desobry that he had never performed the trust, etc. He answered that it was not true. ■ After stating that plaintiff knew that he used the money in his business, Tete was asked how he knew that fact. He answered: “ Because, the next day after I gave him the receipt for the money to be invested, Mr. Desobry called upon me, at my office, and requested me to use the money in my business, at a fixed rate of interest, at ten per cent per annum, and payable every six months.”
This testimony was objected to, and the objection was maintained, on the ground that it tended to contradict or vary the written contract expressed in the receipt; that the receipt created a perfect contract to invest the money for account of plaintiff; and that this testimony tended to prove a second and different agreement, to make a loan and not to invest.
We think the objection was not well taken. The receipt simply shows that the money was to be invested, for account of Desobry, so as to have the interest paid every six months. The testimony did hot tend to vary or contradict the receipt in any respect. “ Invest ” does not necessarily indicate the purchase of property, or stocks, or a loan on negotiable securities. It implies the outlay of money, in some permanent form, so as to yield an income; and the use of the money by Téte, at the required rate of interest, payable every six months, was an investment, in. every sense of the term, not different from that expressed in the receipt.
Besides, plaintiff had attempted to prove, dehors, and beyond the receipt, that the understanding was that the investment was to be in good commercial and mortgage paper; and such proof was essential to his case. The testimony of Téte was clearly admissible to prove that this was not the understanding.
It was also admissible to disprove the allegation of the petition that Téte, in violation of the trust confided in him, “ unknown to petitioner,” had retained the money in his possession.
If we should balance the testimony of Desobry by that of Tete, the allegations of the petition would simply be not proven. The testimony of Desobry, as to the manner in which the investment was to be made, is not supported by any proof in the record; and his statement that it was to be doubly and triply secured, by commercial and mortgage paper, presupposes a stringency in the money market, and a superfluity of good securities, which do not usually co-exist, and which, in the nature of things, could be but temporary.
The testimony of Téte is strongly corroborated by the entire his *817 tory of this business. From February, 1870, up to January, 1873, when Tete suspended, no inquiry was made by Desobry, no question asked as to how his money had been invested. He had the receipt in his possession, and knew that it contained no limitation of Téte’s discretion as to the manner of investment, except as to the payment of the interest, the rate of which it did not fix. Téte’s clerks prove the manner in which the accounts with Desobry were kept, from the beginning, and the frequent rendering of accounts to Desobry. The large dealings between Téte and Desobry, and his son, Edward Desobry, and his son-in-law, Dardenne, running through several years : the credit which Téte enjoyed, and his reputed wealth, make it more than probable that Desobry would have preferred to leave his money in the hands of Téte, at a fixed rate of interest, rather than to rely on the uncertainty of finding equally safe investments otherwise, on the required terms.
The debt to plaintiff was not created while Téte was acting in a fiduciary character, within the intendment and meaning of section 33 of the bankrupt act, as interpreted by the Supreme Court of the United States, and the Circuit Court, in the cases cited : There is no proof of actual fraud, or of intentional wrong, or of moral turpitude on the part of Tete ; and there is nothing in the record to take the debt sued for out of the operation of the discharge in bankruptcy.
The judgment appealed from is therefore annulled, avoided, and reversed ; and it is now ordered, adjudged, and decreed that the demand of the plaintiff, appellee, Louis Desobry, be rejected, and his suit and petition be dismissed; and that he pay the costs in this court and in the District Court.
Mr. Justice DeBlanc does not concur in this opinion and decree.
Mr. Justice White dissents and reserves his right to hereafter file his reasons.